PER CURIAM.
This matter is before us on complaint of The Florida Bar against Paul C. Mueller, a member of The Florida Bar, report of the referee and petitions for review of Mueller and The Florida Bar.
Respondent was charged by complaint of The Florida Bar with eleven counts of misconduct, including six counts of improper dual representation in the sales of employment agency franchises, two counts of filing a false affidavit with The Florida Bar alleging personal improprieties committed between two of his former partner’s secretaries and the former partner, one count that respondent solicited a client away from his former law partner, one count of false accounting to a client, and one count of improper plea bargaining and improper representation in the handling of two separate clients in criminal cases.
The referee, after considering the voluminous record of pleadings and evidence before him, found as follows:
“As to Count I
“1. That John C. Queen agreed to employ the respondent as his attorney even though the uncontroverted testimony indicated that the respondent was, and had been previously employed by Pauline Win-gate in the purchase-sale transaction of an employment agency.
“2. That Queen had told respondent that he (Queen) would hire his own attorney and that in response thereto, the respondent told Queen that he (the respondent) could-represent him in the transaction ‘and save money’. Respondent told Queen that he could represent both sides in good faith and that the fee would be paid by each equally. Queen did pay respondent V2 of the quoted fee of $285.
“3. That at first Queen was advised by respondent that the seller (Wingate) would have to hold 10% of the stock of the sale of the corporation known as Ter Systems Inc.’; that thereafter respondent advised Queen that Wingate would have to hold 51% of the corporate stock, all of which indicated at that time the apparent lack of knowledge of the respondent as concerned the purchase/sale of the employment agency in question.
“4. That during the period of time that respondent ‘represented’ Queen (June of 1971 to November of 1971 when Queen retained the services of attorney John Kruse of Fort Lauderdale), respondent knew or should have known that Wingate was having trouble with the Secretary of State office as concerned her private employment agency license; that in respondent’s dual representative capacity he should have made this fact known to Queen but he did not.
“5. Although Count I of the Complaint of The Florida Bar alleged (Para. 5) that Per Systems Inc. was to be the actual employment agency, this was not in fact the case. Wingate and Queen entered into an ‘Independent Agency Employment and Purchase Agreement’ on June 17, 1971. (Bar Exh. 5) It did not involve the corporation in question.
“6. That respondent should not have represented both parties (Queen and Win-gate) in this transaction. He could not give adequate, proper, impartial representation to Queen because his ‘real’ client was Pauline Wingate and it was obvious that his independent professional judgment was affected by this to the prejudice of Queen.
“7. That it is uncontroverted that the respondent represented Pauline Wingate in her suit against Queen in this business *962 transaction wherein the respondent originally represented both Wingate and Queen. (Cplt.Exh. 16) The respondent’s defense is that Queen raised no objection to his (the respondent’s) representing Wingate in that action. That was the respondent’s only defense. The Referee finds it unacceptable even though the case was ultimately dismissed for want of prosecution on the Court’s own Motion.
“As to Count II
“1. That Frank J. Keena saw an ad in the local newspaper placed by Pauline Win-gate for the sale of an employment agency. Keena and Wingate met at the law offices of the respondent. A contract was prepared between Wingate and Keena. The testimony of witness Keena did not indicate who prepared same. Mueller witnessed the contract but on his direct examination he denied preparing same. (Cplt.Exh. 21)
“2. That the total consideration paid by Keena for the purchase of an ‘employment agency’ was $10,000, $5,000 of which was paid by Keena to respondent’s Trust Account on August 6, 1971.
“3. That at the contemplated closing time and place of this purchase/sale transaction, Keena brought a letter from Attorney Ted Sobo; that prior to the closing Keena had consulted with Mr. Sobo and apparently outlined the sum and substance of the transaction; that Sobo because of press of other business could not appear at the closing but prepared a letter (Cplt.Exh. 24) outlining what he (Sobo) felt was necessary; that respondent told Keena it was ‘O.K. to close’ and that he (Mueller) represented him (Keena) as well as Wingate; that Keena called Sobo and then came back into respondent’s office and agreed to close on or about August 6, 1971.
“4. That it was uncontroverted that Keena then looked upon the respondent as his Attorney and the respondent considered Keena as his client; that Keena in fact did pay one-half of the fee charged by respondent in this transaction to respondent. (Cplt.Exhs. 26 and 27)
“5. That Keena testified (and it is believed by this Referee) that he thought he was buying a ‘going business’; that respondent knew or should have known that the transaction did not involve a ‘going business’ and if respondent did know this (which Referee believes he did) he (the respondent) failed to advise his ‘client’ Keena.
“6. Keena became disenchanted with the operation of the business and advised Wingate and the respondent that he (Kee-na) ‘wanted to get out from under’; that thereafter Mueller drew up an agreement giving Keena an option to sell the ‘business’ back to Wingate for $10,000. (Cplt.Exh. 30) On September 22,1971 Keena exercised this option; that respondent testified that in his opinion ‘equitable title passed immediately to Wingate’. (Underscoring mine); that the return sale/purchase to Wingate was apparently concluded on November 29,1971 when a Bill of Sale (Cplt.Exh. 33) Absolute was acknowledged by a Notary Public alleged by respondent not to be known to him; that respondent testified he did not prepare the instrument. The records of these proceedings are silent in that regard except as testified to by respondent; that prior to the consummation of this repurchase of Keena’s interest by Wingate, Win-gate did receive a check dated November 20, 1971 from one Willard J. Sullivan for the sum of $10,000 (Cplt.Exh. 39) representing a partial payment on an agreed selling price of $15,000.
“7. That respondent know [sic] of this transaction and did in fact participate in it, well knowing that Keena had not at that time concluded his ‘sell-back’ transaction with Wingate.
“As to Count III
“1. That complaining witness Willard J. Sullivan did answer Pauline Wingate’s ad in a local newspaper as concerns the sale of an employment agency on or about November 16, 1971; that in any event Wingate and Sullivan signed a deposit receipt contract (Cplt.Exh. 38) on November 20, 1971; that Sullivan gave Wingate a check for $10,000 on November 20, 1971 (Cplt.Exh. 39); that *963 Sullivan and Wingate signed a franchise agreement on November 20, 1971; that both instruments were admittedly prepared by the respondent (Cplt.Exh. 40).
“2. That at that time (November 20, 1971) Wingate did not own the business that was ‘sold’ to Sullivan; that the ‘business’ in question was still owned by Frank J. Keena, the Complainant referred to in Complainant’s Count II; that Keena did not sell the business back to Wingate until November 29,1971 (the date of the Bill of Sale signed by Keena to Wingate; Cplt.Exh. 33).
“3. That although Sullivan had earlier indicated to the respondent that he (Sullivan) wanted to hire his ‘Chicago Attorney’, that Sullivan testified that the respondent told him he would not have to ‘bother’ with a ‘Chicago Attorney’ and that he (the respondent) offered to be Sullivan’s Attorney. Sullivan’s testimony which was unrefuted was that he paid the respondent $285 for legal fees.
“4. That the respondent knew that at the time of the sale of the business in question to Sullivan that Wingate really did not own it. (See paragraph 2 above).
“5. That Wingate appeared before a State examining board representative on November 24, 1971 to show cause why her agency employment license should not be suspended; that respondent appeared personally with Wingate at that hearing; that respondent knew or should have known that Wingate had these problems and should have made this known to ‘his client’ Sullivan of these ‘problems’; that respondent testified that he would have told this to Sullivan ‘if he had asked’.
“6. That by reason of the findings of the examiner at the hearing on November 24, 1971, Sullivan’s ‘employment agency’ was closed down on January 18,1972 by order of the Department of State.
“7. That the ‘buyer’s’ closing statement involving Sullivan and Wingate was dated December 6, 1971 (Cplt.Exh. 42) indicating the payment by Sullivan to Wingate of the sum of $5,285 (Cplt.Exh. 41) which included respondent’s ‘fee’.
“8. Respondent admits filing suit against Sullivan on February 27,1972 (Cplt. Exh. 44) on behalf of client Wingate; that respondent insisted that he considered it quite proper unless Sullivan would have ‘objected’. The Referee finds this reasoning untenable.
“As to Count IV
“1. That complaining witness Elmer Perry answered an ad in a local newspaper of Wingate in August of 1971 as concerned the sale of an ‘employment agency’; that shortly thereafter Wingate introduced Perry to the respondent in the respondent’s law office and he told Perry that he (respondent) would represent him (Perry) in this sale/purchase transaction.
“2. That a deposit receipt contract was signed by Perry and Wingate in Respondent’s office on August 20, 1971 (Cplt.Exh. 47); that it can be presumed that subject contract was prepared by respondent since it was on his printed letterhead.
“3. That thereafter Perry and Wingate signed an ‘agency agreement’ on August 30, 1971 in respondent’s office; that this ‘agreement’ was prepared by respondent (Cplt.Exh. 48).
“4. That respondent knew or should have known of the constant and continuous problems involving his ‘client’ Wingate in getting these agencies in operation and of the failure of Wingate to work with his respective ‘clients’ (Quinn, [sic] Keena and Sullivan) and yet failed to advise his ‘client’ Perry of these problems.”
As to Count V
Upon motion of The Florida Bar, this count was dismissed by the referee.
“As to Count VI
“1. On September 30, 1973, one Sol Kleinman and Pauline Wingate entered into an agency agreement (Cplt.Exh. 55) which was prepared by respondent. The agreement provided that Wingate was to get $3,000 ‘to buy equipment’; that in addition thereto Kleinman paid $4,500 to re *964 spondent which was placed in his Trust Account (CpltExh. 57). This second sum was to be used to purchase additional equipment. Although respondent testified the $3,000 was to go to Wingate for her services, Kleinman denied this. Kleinman testified that the $3,000 was to be used for obtaining the leasehold, furniture, etc. I so find from the evidence and testimony.
“2. Kleinman testified that in the beginning he did not consider respondent as his Attorney until respondent (according to Kleinman) insisted that his fees be paid out of the sum paid to his escrow account. Kleinman testified that he did then consider respondent to be his Attorney. Although respondent denied vigorously that he never [sic] considered Kleinman as his client, I recommend a finding that there definitely developed between the parties (Kleinman and respondent) an Attorney-client relationship.
“3. That during all these proceedings Wingate did not have any agency employment license nor any type of ‘employment’ license; that it had been suspended by the Secretary of State on September 15th, 1973 and this was known by the respondent; that respondent knew this and admitted knowing this; that respondent insisted in his testimony that this was not material as long as Kleinman got an ‘agency employment license’. I disagree. It was the duty of respondent to advise Kleinman of the license status of Wingate. Kleinman received a letter from respondent dated February 1, 1975 (Cplt.Exh. 67) that his law firm had extended office hours, addressed to ‘our clients’.
“4. That respondent knew or should have known from his past dealings with Wingate that she was irresponsible and did not live up to her agreements; that respondent admitted receiving many complaints from Queen, Keena, Sullivan and Perry but nevertheless continued his representation of her and simultaneously represented all of the previous complainants.
“As to Count VII
“1. That Rosemary Keyte LaChance, the complaining witness in this Count, was employed by respondent’s former law partner, Joel Miller, from September of 1969 to November of 1969; that according to her un-controverted testimony she quit ‘because she got a job that paid more.’
“2. That respondent submitted a sworn affidavit dated September 30, 1971, to The Florida Bar (Cplt.Exh. 68, at page 12) that in effect stated that Miller asked the witness if she would agree to have sexual relations with him; this was vigorously denied by the witness who was the subject matter of that affidavit.
“3. That she admitted seeing respondent only on occasion thereafter and even spending a weekend with him in the Tampa area but s denied any improprieties therein.
“4. That Joel Miller testified that he never made any ‘advances’ towards the witness.
“5. That the respondent testified in answer to the question ‘What precipitated your making these charges against Miller?’, respondent replied; ‘He (Miller) was taking pot shots at me’. The respondent testified that he had no personal knowledge of this except for ‘conclusions’ he reached from inferences and innuendoes in his conversations with the witness.
“6. That there was no basis whatsoever for the respondent to draw such a ‘conclusion’ from his own testimony and certainly from the testimony of witnesses LaChance and Miller.
“As to Count VIII
“1. Florida Bar complaining witness Eloise Fox Young testified that she worked for Joel Miller, respondent’s former law partner, as a secretary in Fort Lauderdale from 1963 to May of 1964, for eight or nine months.
“2. That in response to the questions ‘Did Joel Miller ask you to have sexual relations?’ and ‘Did he (Miller) ever threaten you?’ she answered ‘No’ in each instance.
“3. That Joel Miller testified that he never asked her (Young) to have sexual *965 relations nor ever having threatened her [sic].
“4. That witness Young further testified that respondent called her by telephone in 1970 or 1971 (which was admitted by respondent in his own testimony) at which time respondent said to her T heard you hate Miller’s guts’. She denied hating him. Respondent then asked her if Miller had ever made any ‘advances’ towards her and ‘chased her’. She denied this and said T would have killed him or I would have succumbed’.
“5. That there was no truth whatsoever to these charges brought by respondent against Miller in his affidavit to Florida Bar (Cplt.Exh. 68, page 12) and the respondent knew this.
“6. That not any of the testimony of the respondent on his direct examination indicated that he had any reason whatsoever to make such a charge and that it was strictly a figment of his imagination.”
As to Counts IX and X
As to these counts, the referee recommends a finding of not guilty.
“As to Count XI
“1. That George Naze II was an Assistant County Solicitor of Broward County, Florida, on or about January 28, 1971; that he was employed in that capacity from December of 1970 to June of 1971.
“2. That prior to January 28, 1971 the respondent represented one Henry Lee Powell in a criminal charge filed against him (Powell) in Broward County as concerned a felony charge of aggravated assault.
“3. That also prior to January 28, 1971, the respondent represented a client known as Dr. Bernston in a criminal charge filed against him (Bernston) in Broward County as concerned a misdemeanor charge of simple assault; that the ‘simple assault’ concerned the complaint of a neighbor that Bernston had turned a garden hose upon said neighbor, getting him (the neighbor) all wet from the water discharged from the hose.
“4. That on or about January 28, 1971, the respondent met witness George Naze II in the Broward County Courthouse, Fort Lauderdale, Florida, and did, in fact, offer to plead his client (Powell) guilty of the crime of aggravated assault if the charge against his client Bernston was dismissed.
“5. That the said George Naze II did not report this incident to anyone, but did, sometime later, advise Attorney Howard M. Zeidwig of this conversation; that Zeidwig knew Attorney Joel Miller and that Zeidwig in fact had law offices in the same building where Miller had law offices; that Zeidwig in turn passed this information to Joel Miller who in turn filed a complaint concerning these allegations with the Florida Bar.
“6. That it is obvious from the records, files, proceedings and exhibits of these entire proceedings that there is and has been extreme animosity between Miller and Mueller and that these persons have had extensive litigation in the local Courts wherein they personally sued each other for accountings, damages and ‘what have you’.
“7. That although respondent admitted the meeting in question with Naze, he denied making such a ‘plea bargaining’ proposition; that the respondent did admit that he attempted ‘plea bargaining’ but that the ‘plea bargaining’ did not involve any agreement to use one client’s interest against the other client’s interest; that I find Naze’s testimony to be true and do not believe the respondent.
“8. That ultimately the charge against Powell was nol prossed, then later refiled and later the charge was dismissed apparently because the complaining witness could not be located.
“9. That Bernston’s charge of simple assault (or assault and battery) was ultimately dismissed.”
As to Count I, the referee recommends that respondent be found guilty of violating Disciplinary Rule 5-105(A), in that he represented one of the parties to the transaction (Wingate) in a law suit against the second party (Queen) to the transaction, *966 and violating D.R. 5-105(B), in that his representation of Wingate adversely affected his representation of the second client (Queen). As to Count II, the referee recommends that respondent be found guilty of violating D.R. 5-105(A), in that he represented both parties in the transaction and in that his representation of Keena was prejudicial to Keena because of his continued representation of Wingate, and violating D.R. 5-105(B) because representation of Wingate adversely affected representation of Keena. The referee recommends that respondent be found guilty of Count III for having violated D.R. 5-105(A), in that he represented one of the parties to this transaction (Wingate) in a law suit against a second party (his client, Sullivan) in the transaction and in that respondent’s testimony would be material, and for having violated D.R. 5-105(A) and (B) by failing to advise Sullivan that Wingate’s license was in jeopardy. Relative to Count IV, the referee recommends that respondent be found guilty of violating D.R. 5-105(A), in that he represented both parties to the transaction resulting in prejudice to Keena because of continued representation of Win-gate and of violating D.R. 5-105(B) because his representation of Wingate adversely affected his representation of Keena. Count V was dismissed upon motion of The Florida Bar. The referee recommends that respondent be found guilty of Count VI in violating D.R. 5-105(A) and D.R. 5-105(B) for representing Kleinman when such representation adversely affected Kleinman’s interest because of respondent’s close relationship with Wingate, and in violating D.R. 1-102(A)(3), (A)(4) and (A)(6) by engaging in illegal conduct involving moral turpitude, dishonesty, fraud, deceit and misrepresentation and which reflects adversely on his fitness to practice law. The referee granted respondent’s motion for summary judgment as to Count IX and recommends that he be found not guilty of Count IX and Count X. As to Count XI, the referee recommends a finding of guilty of violating D.R. 1-102(A)(5) and 5-105(B), in that respondent engaged in conduct prejudicial to the administration of justice and adverse to the interests of his client Powell.
In conclusion, the referee recommends suspension for thirty months and, thereafter, until respondent shall prove his rehabilitation, and for an indefinite period until he shall pay the costs of these proceedings ($8,426.00) plus whatever additional costs may be incurred.
The Bar petitions for review of the recommended disciplinary measure and requests disbarment. Respondent requests review of the findings of the referee and rulings on certain pretrial orders.
Having carefully reviewed the record in light of respondent’s fifty-two points for review, we hereby approve the findings and recommendations of the referee as to guilt, with the exception of his finding and recommendation as to Count XI, which charge we find to be barred by laches.
However, with respect to the appropriate disciplinary measures to be imposed on respondent, The Florida Bar suggests that respondent’s conduct warrants disbarment rather than the thirty month suspension recommended by the referee. We agree.
Accordingly, Paul C. Mueller is disbarred. The disbarment shall be effective on October 3, 1977, thereby giving respondent time to close out his practice and take the necessary steps to protect his clients, and it is ordered that respondent shall not accept any new business. The filing of a petition for rehearing shall not alter the effective date of this disbarment. Execution is directed to issue for the costs of these proceedings against the respondent in the amount of $8,426.00.
It is so ordered.
OVERTON, C. J„ and ENGLAND, HATCHETT and KARL, JJ., concur.
ADKINS, J., dissents.